## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 23 2015, 9:26 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

S. Rod Acchiardo
Tell City, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Larry R. Flanagan, <br> *Appellant-Respondent,* <br><br> v. <br><br> Mary J. Beckman, <br> *Appellee-Petitioner.* | October 23, 2015 <br><br> Court of Appeals Case No. <br> 62A01-1504-PO-145 <br><br> Appeal from the Perry Circuit Court <br><br> The Honorable M. Lucy Goffinet, Judge <br><br> Trial Court Cause No. <br> 62C01-1501-PO-27 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Larry Flanagan (Flanagan), appeals the trial court's issuance of a protective order against him in favor of Appellee-Petitioner, Mary Jo Beckman (Beckman).

We reverse.

## ISSUE

Flanagan raises one issue on appeal, which we restate as the following: Whether there was sufficient evidence to issue a protective order.

## FACTS AND PROCEDURAL HISTORY

Beckman is Flanagan's sister. There are eight siblings in total and Flanagan is the only son. Their Parents had a farm in Perry County, Indiana, and because Beckman and her husband lived close to the Parents, they would, from time to time, help the Parents with the farm. In 1994, the Parents were struggling financially and it was agreed that Beckman would buy a portion of the farm to ease their financial strain. Also, it was decided that Beckman would pay for the land over a period of time. All siblings were informed and were on board with this arrangement. Four years later, in 1998, Beckman finished paying for the first parcel of land, and she proposed buying additional land from the Parents. This time, however, Beckman's and Flanagan's father (Father) needed the money upfront, so Beckman refinanced her house to pay for the land.

[5] In February of 2011, ninety-three-year old Father died in his sleep. Weeks after the burial, the siblings made a demand for proof of payment of all the land that Beckman had purchased from the Parents. The sibling also had a survey conducted for the residual land. Beckman's and Flanagan's mother (Mother), who hated farm life, sought to sell off the farm quickly and move to the city.

[6] Around the same time, Beckman claims that Flanagan visited her home and demanded that she should write a check for $134,000 to purchase the remaining farm land and the Parents' home. Thereafter, on August 9, 2011, averring to act as an agent of Mother in accordance with his power of attorney, Flanagan sent Beckman a letter captioned, "American Greed." (Tr. p. 10). In that letter, Flanagan claimed that there was a discrepancy in the survey that Beckman had conducted when she purchased the first parcel of land in 1994; therefore, the property line was incorrect, and it was crucial for that mistake to be rectified. In the same letter, Flanagan requested that Beckman sign a deed that he had drawn up. Flanagan indicated that if Beckman failed to comply, he would be suing her for fraud.

[7] Beckman did not heed Flanagan's demands, so on August 24, 2011, Flanagan again made contact with Beckman. This time, Flanagan left a telephone voice message to Beckman stating, in part, that

> Mary Jo, . . . all we are waiting on now is getting the pond settled. So we need to get that done. I have got the letter that you give (sic) Carol Jean and [] I am going to take it to John Werner [on] Friday and let him look at it. But personally[,] I think its pretty much a joke. I don't think it will hold up in court

because it is not legal. [] But anyway we need to get the pond settled . . . you have [] a legal deed to the pond, land, [] but may I remind you that when you bought that land, [] you made it a point to tell me that it was a short section, that you was buying x number of acres, . . . the deal [was] up to the pond []. [] So now since you made a mistake on the surveying, [] you think you [] got it[?] . . . Other than that, [] if you don't want to cooperate, there is ways to make you cooperate[,] so hopefully we don't have to go that route.

(Tr. p. 15).

[8] Meanwhile, Beckman acquired a deed for all the land she had purchased from the Parents, and reverted the disputed portion—the pond—to Mother. According to Beckman, around the same time, Flanagan informed Beckman's neighbors about the dispute. Also, Flanagan visited his other sister's place of work, Carol Jean (Jean), with an aerial view of the farm and informed her about the disagreement.

[9] According to Beckman, for three years, Flanagan had no contact with her. However, in January of 2015, Flanagan got wind that Beckman and Jean were organizing a Christmas family gathering. Flanagan was not invited to the party. As such, on January 5, 2015, Flanagan wrote to Beckman a letter stating:

I hear that you are having a little get together. [] I want to thank you for doing this because I really want to hear the real story too. [] I really want to find out who took (stole) all of Dad's papers (all his Records, Bank Statements etc.) from his bedroom right after he passed. And what this person was (or is) covering up. []

Also[,] I am looking forward to hearing this person tell why they stole all of his papers.

So Mary Jo, me [and] my [h]onest sisters are looking forward to this meeting. See you on the 10th.

Your honest [b]rother.

P.S.
Mary Jo, Thanks again for doing this. Because it's time for everybody to know the real truth.

(Appellant's App. p. 16).

On January 16, 2015, Beckman filed a petition for a protective order against Flanagan. On March 30, 2015, Beckman and Flanagan appeared *pro se*, and they both argued their cases. After hearing all the evidence, the trial court found that Beckman "has shown by preponderance of the evidence that stalking has occurred" to justify the issuance of a protective order. (Tr. p. 26).

Flanagan now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

As an initial matter, we note that Beckman did not file an appellee's brief. When an appellee fails to file a brief in response, we need not undertake the burden of constructing an argument on the appellee's behalf. *Tisdial v. Young*, 925 N.E.2d 783, 784 (Ind. Ct. App. 2010). We will reverse the trial court's judgment if the appellant presents a case of prima facie error, which is defined

in this context as "at first sight, on first appearance, or on the face of it." *Id.* at 784-85.

[13] In reviewing the sufficiency of the evidence to support the trial court's judgment regarding a protective order, we neither reweigh the evidence nor resolve questions of credibility. *See Tons v. Bley*, 815 N.E.2d 509, 511 (Ind. Ct. App. 2004). We consider only the probative evidence and reasonable inferences that support the trial court's judgment. *Maurer v. Cobb-Maurer*, 994 N.E.2d 753, 755 (Ind. Ct. App. 2013). We will reverse the trial court's judgment regarding a protective order only if it is clearly erroneous—that is to say, when a review of the record leaves us firmly convinced that a mistake has been made. *See Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1076 (Ind. Ct. App. 2011), *trans. denied*.

[14] The Indiana Civil Protection Order Act (the Act) provides that a protective order may be issued when a trial court finds, by a preponderance of the evidence, that the respondent represents a credible threat to the safety of the petitioner or a member of the petitioner's household—that is, that domestic or family violence has occurred. *See Maurer*, 994 N.E.2d at 755 (citing Ind. Code § 34-26-5-9). Except for an act of self-defense, "domestic or family violence" means the occurrence of at least one of the following acts committed by a family or household member:

> (1) Attempting to cause, threatening to cause, or causing physical harm to another family or household member.
> (2) Placing a family or household member in fear of physical harm.
> (3) Causing a family or household member to involuntarily

engage in sexual activity by force, threat of force, or duress. (4) Beating [ ], torturing [ ], mutilating [ ], or killing a vertebrate animal without justification with the intent to threaten, intimidate, coerce, harass, or terrorize a family or household member.

For purposes of IC 34-26-5, domestic and family violence also includes stalking (as defined in IC 35-45-10-1) or a sex offense under IC 35-42-4, whether or not the stalking or sex offense is committed by a family or household member.

I.C. § 34-6-2-34.5.

[15] In seeking a protective order against Flanagan, Beckman bore the burden of proof by a preponderance of the evidence that Flanagan represents a credible threat to her safety. Here, the trial court concluded that the two letters that Flanagan had sent to Beckman as well as the voice message, were "inappropriate." (Tr. p. 23). As such, the trial court found that there was evidence of *stalking* and Beckman was entitled to a protective order.

## II. *Stalking*

[16] Stalking is defined as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." I.C. § 35-45-10-1.4 "Harassment" in turn is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer

emotional distress and that actually causes the victim to suffer emotional distress." I.C. § 35-45-10-2.

[17] In the present case, Beckman testified that Flanagan's letter and telephone voice message which occurred in 2011, as well as the letter addressed to her in January 2015, made her feel threatened and intimidated. In his appellate brief, Flanagan argues that the "sporadic contacts are arguably not sufficient to constitute a repeated or continuing conduct" that would cause a reasonable person to suffer emotional distress. (Appellant's Br. p. 8). Specifically, he posits that the two contacts in 2011 "are too remote in time to constitute a sufficient threat to Beckman." (Appellant's Br. p. 8). Justifying his contacts with Beckman, Flanagan argues that he had "a legitimate business interest over which he was attempting to communicate with Beckman[—]*i.e.* an accounting, division and sale of the real property that was part of their father's estate." (Appellant's Br. p. 8).

[18] At trial, Beckman stated:

> The survey showed that [] the line was a couple of feet north from where [] Flanagan thought it should be. It touched the farm pond that was a water source for the barn. I told him that I would give them the pond. He is not a lawyer, he is not a surveyor and he is not the land owner. I think those are the only people who can write deeds. . . . He demanded that I sign this illegal deed. [] So [] I refused. Okay, so I proceeded to get [] a legal deed [] and I gave them the pond they were screaming about. It was 1/10th of an acre. [] After this was done, the screaming continued. They wanted me to get a new survey and move the line. So I no longer responded to this. He has my

mother thinking she is totally incompetent, which she is not.
****

. . . He has always enjoyed teasing and tormenting our kids to make them cry. We had to be on guard all the time when he was around to protect our kids. . . . my daddy said that my sister was kind of like a cow, circling her calf to make sure that her kids weren't tormented by him. Studies have showed that this type of personality is that type that goes crazy and does things. Which I do not want to be a statistic. I am scared. I have installed driveway alarms, I have installed an ADT system in my home. He does not act rationally and I don't want to wait around to see what he does next. I don't want to be a statistic when he goes berserk.

(Tr. pp. 11-12).

[19] In response to Beckman's claims, Flanagan pointed out that he was not stalking Beckman, but "all I was trying to do was . . . get the place sold and . . . Beckman was not cooperative . . . ." (Tr. p. 17). In addition, Flanagan denied ever going to Beckman's house to demand a "check for $134, 000 for the remaining land and house"; rather, because Beckman was not cooperating, Flanagan instructed his sister "to offer [Beckman] to buy the rest of the property at the appraisal price." (Tr. p. 17). As for the 2015 letter, Flanagan indicated that even though he was not invited to the family gathering, it was not at Beckman's house but at Jean's house.

[20] Viewed from the perspective of our standard of review, we agree with Flanagan that the evidence is insufficient to sustain the issuance of the protective order. We initially note that Flanagan had Mother's power of attorney, and after

Father's demise, he had the undertaking of closing the estate. Turning to the first "stalking" incident—the American Greed letter of 2011—we find that this letter does not give rise to a plausible claim that Beckman felt terrorized, frightened, intimidated, or threatened. We note that this letter meant to settle the issues regarding the land survey and the fact that Beckman had wrongfully acquired the pond. When Beckman failed to respond to Flanagan's requests, Flanagan left Beckman a voice message indicating that the pond issue remained unsolved. Furthermore, the record shows that Flanagan's statement in the voice message: "if you don't want to cooperate, there is ways to make you cooperate," was nothing more than Flanagan's way of informing Beckman that he would engage a lawyer if Beckman failed to comply. (Tr. p. 15).

[21] Furthermore, no evidence was presented to the trial court that would permit an inference that a reasonable person would feel terrorized, frightened, intimidated, or threatened by the receipt of the 2015 letter. The evidence presented at trial indicates only that, after three years of no contact, separate from the land dispute, Flanagan initiated a third contact by informing Beckman that he would be attending the family gathering and that his other sisters were expecting an explanation of Father's missing documents. As such, we find that this letter contained nothing a reasonable person would consider ominous or intimidating.

[22] Here, although Beckman felt that Flanagan's contacts were unwelcomed, Flanagan had every right to contact her on any issues affecting Father's estate as he had Mother's power of attorney. In this regard, we find that no evidence

was presented to the trial court that would permit an inference that Flanagan intended to stalk Beckman by the three contacts: two in 2011 and one in 2015.

## CONCLUSION

In light of the foregoing, we find that there was insufficient evidence of stalking to support the issuance of a protective order.

Reversed.

Brown, J. and Altice, J. concur